Not for Publication

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHARON OTERO, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 14-1655 (ES) (JSA) |
| | OPINION |
| PORT AUTHORITY OF NEW YORK AND NEW JERSEY, *et al.*, | |
| Defendants. | |

SALAS, DISTRICT JUDGE

Before the Court is a motion to dismiss filed by defendants Port Authority of New York and New Jersey, Michael Fedorko, John Ferrigno, Nicholas Tagarelli, Richard Brezicki, Michael Ford, Michael Thomas, and William Korbul's (collectively, "Defendants").  (D.E. No. 171 ("Motion")).  Defendants seek to dismiss the claims raised against them by the sixty-eight plaintiffs (collectively, "Plaintiffs") in their seventh amended complaint (D.E. No. 167 ("Seventh Amended Complaint" or "SAC")).  The Court held an oral argument on June 9, 2020.  (D.E. No. 185).  Having considered the parties' written and oral arguments, for reasons set forth below, Defendants' Motion is GRANTED: Plaintiffs' federal claims are DISMISSED *with prejudice*, and the Court declines to exercise supplemental jurisdiction over the remaining state claims and will DISMISS these claims *without prejudice*.

## I.     BACKGROUND

### A.     Factual Background

This case involves the promotion policy and practice of defendant the Port Authority Police Department ("PAPD") of the Port Authority of New York and New Jersey ("Port Authority"). Plaintiffs were police officers at the PAPD at all times relevant to this case.  Plaintiffs allege that the PAPD announced various promotion policies and procedures and, from 2011 to 2015, promoted about 145 officers to sergeants.  (*See generally* SAC).  Plaintiffs allege that the Port Authority "intentionally and knowingly ignored and violated" its promotional policies.  (*Id.* ¶ 397). Instead, Plaintiffs claim, the promotion decisions were "tainted by nepotism, cronyism[,] and unlawful practices," and officers were promoted based on their "political associations, affiliations[,] and political support."  (*Id.* ¶¶ 133–94).  Plaintiffs further allege that the promotional evaluations were conducted in an arbitrary and capricious manner, giving unfair advantages to favored candidates.  (*See generally* SAC).

#### i.     *The 2010 Announcement and the First Written Examination*

On March 3, 2010, the PAPD announced its policies for officers to be promoted to sergeants.  (SAC ¶¶ 106–07).  Specifically, to be qualified for the promotion, the officers must have three years of in-grade experience at the time of the written examination and four years of in-grade experience at the time of promotion; all discipline must be resolved; officers with five or more sick occasions or thirteen or more days lost in the last twelve months were not permitted to partake the promotional process.  (*Id.* ¶¶ 108–10).  The PAPD would also conduct a written examination; qualified candidates who passed the written examination would be placed on a Police Sergeant Horizontal Roster ("2010 Horizontal Roster").  (*See id.* ¶¶ 111 & 113–14).  When a vacancy for sergeant became available, officers would be randomly selected from the Horizontal

Roster to be evaluated for promotion.  (*Id.* ¶¶ 115–17).  Each candidate would be evaluated in seven categories: (i) breadth of experience/exposure, (ii) police sergeant roster promotional/developmental appraisal, (iii) qualifications review meeting ("QRM"); (iv) attendance; (v) discipline, (vi) CCIU[1] Complaints, and (vii) investigation.  (*Id.* ¶ 121).  For the third evaluation criteria, the QRM, each candidate would be interviewed by a three-person panel consisting of two members of the Port Authority human resources department and one PAPD superior officer.  (*Id.* ¶ 122).  As a result, different individuals made up the panels for each QRM. (*Id.*).  Based on the score received for each of the seven categories, candidates would receive an overall recommendation of "Not Recommended," "Recommended," or "Highly Recommended." (*Id.* ¶ 130).  Promotions would then be made by Defendant Michael Fedorko, who was the Superintendent of the PAPD.  (*Id.* ¶ 131).

On April 17, 2010, qualified candidates took the written examination, the results of which came out on December 1, 2010.  (*Id.* ¶¶ 111–12).  Four hundred and sixty-five officers, including all Plaintiffs, passed the written examination and were placed on the 2010 Horizontal Roster.  (*Id.* ¶¶ 113–14).  On June 15, 2011, the PAPD issued the first promotional job posting, announcing that there were sergeant positions available.  (*Id.* ¶ 210).  From June 25, 2011, to June 27, 2011, sixty officers were purportedly chosen at random from the 2010 Horizontal Roster to be evaluated and interviewed.  (*Id.* ¶¶ 215–19).  On July 8, 2011, fourteen officers were promoted to sergeants. (*Id.* ¶ 220).

Plaintiffs allege that defendant John Ferrigno, who was the lieutenant responsible for the supervision of the Port Authority Police Academy (the "Academy"), took photographs of the

---

[1]     Nowhere in the Seventh Amended Complaint addresses this acronym, but it appears to stand for the Port Authority's "Civilian Complaint Investigations Unit."  *See Office of Inspector General (OIG)*, Port Auth. NJ NY, https://www.panynj.gov/port-authority/en/help-center/oig.html (last visited Aug. 24, 2021).

questions and answers for the QRM in 2010 and disclosed the information within the Academy from 2010 until he was forced to retire in May 2012. (*Id.* ¶¶ 195–99). Plaintiffs further allege that defendants Richard Brezicki and Nicholas Tagarelli either witnessed Ferrigno taking the pictures or were otherwise aware of Ferrigno's conduct, but they did not report him to Inspector Brian Sullivan, who is no longer a party in this case, until ten months after the pictures were taken. (*Id.* ¶¶ 202–05). Defendants, who allegedly were aware of Ferrigno's conduct, proceeded with the promotion process, giving officers who had the QRM questions and answers an unfair advantage. (*Id.* ¶¶ 208 & 227).

As a result of Ferrigno's conduct, the Academy, which was "the smallest commands of the [PAPD]" received a disproportionate number of promotion opportunities among its officers—seven of the fourteen officers promoted on July 8, 2011, either worked at the Academy or had recently been instructors at the Academy, and at least three of the seven officers were directly involved in the dissemination of the examination materials. (*Id.* ¶¶ 229–31). Ultimately, of the 100 officers[2] who were promoted since July 8, 2011, at least twenty-two officers had been assigned to the Academy. (*Id.* ¶ 209).

Plaintiffs also allege that certain individuals who were promoted on July 8, 2011, did not meet the PAPD's criteria required for promotion. (*Id.* ¶ 221). For example, allegedly, one of the promoted officers had pending disciplinary charges at the time of promotion and another promoted officer was ineligible to be promoted because he was not recommended in his QRM and was not recommended by his immediate supervisor as part of his promotional/developmental appraisal.

---

[2]     The Court notes that the Seventh Amended Complaint is inconsistent as to how many officers were promoted from July 8, 2011 to December 15, 2015, the relevant timeframe in this action. Plaintiffs allege that ninety-six officers were promoted from July 8, 2011, to February 7, 2014, as announced in the five promotional lists. (SAC ¶ 281). Plaintiffs then allege that twenty-seven officers were promoted after the instant action was filed but before the 2015 promotional announcement was made. (*Id.* ¶ 297). Finally, Plaintiffs allege that twenty-two officers were promoted on December 15, 2015, making the total number of officers promoted to sergeants 145 since July 8, 2011. (*Id.* ¶ 376).

4

(*Id.* ¶¶ 222–24).  Moreover, Plaintiffs allege that certain officers were promoted because of their political associations.  (*See id.* ¶¶ 146 & 151).  Plaintiffs thus claim that that these promotions were based on inconsistent criteria, that the decisions were made in an arbitrary and/or capricious manner and were "influenced by nepotism, cronyism, political affiliations and/or associations." (*Id.* ¶¶ 122–24).

On November 21, 2012, the PAPD issued the second promotional opportunity announcement.  (*Id.* ¶ 238).  This announcement changed the promotion qualification such that officers on the 2010 Horizontal Roster would only be eligible if they had three or fewer sick absence occasions and eleven or fewer sick days over two of the last three years, which was more stringent than the earlier standard.  (*Id.* ¶¶ 210–12).  After the same evaluation process, on January 23, 2013, the PAPD announced that thirteen officers were to be promoted to sergeant.  (*Id.* ¶ 247). Plaintiffs allege similar unfair and unlawful practices during this process, including inconsistent promotion criteria resulting in arbitrary and capricious promotion decisions (*id.* ¶¶ 241–45), that disproportionate numbers of officers were promoted from the Academy because of the dissemination of the examination materials (*id.* ¶¶ 243 & 248–49), and that promotions were made based on the officers' alleged political associations or nepotism (*id.* ¶¶ 250–52).

Subsequent to the announcement of the second promotional list, in February 2013, the PAPD evaluated the remaining candidates on the 2010 Horizontal Roster, and, on July 26, 2013, the PAPD published a list of forty-six officers who received "Highly Recommended" and "Recommended" ratings.  (*Id.* ¶¶ 254, 259 & 261).  Three days later, on July 29, 2013, the PAPD published the third promotional list, where it announced that twenty-nine officers would be promoted.  (*Id.* ¶ 262).  Again, Plaintiffs allege that the same unfair and unlawful promotion

decisions resulted in promotions of officers who were not qualified. (*Id.* ¶¶ 255–58, 260–61 & 263–68).

On January 15, 2014, the PAPD announced the fourth promotional list and promoted twenty-seven officers to sergeants who were among those that received Highly Recommended or Recommended rating as published on July 26, 2013. (*Id.* ¶ 270). Prior to the announcement, on December 23, 2013, human resources emailed twenty-seven officers to inform them that they would be promoted. (*Id.* ¶ 269). Two officers who received the December 23, 2013 email were not promoted, and two officers who did not receive the email were promoted. (*Id.* ¶¶ 271–72).

On February 7, 2014, the PAPD announced the fifth promotional list and promoted thirteen officers to sergeants. (*Id.* ¶ 276). Plaintiffs allege that these two sets of promotions were similarly unfair and were "tainted by nepotism, cronyism and unlawful practices." (*Id.* ¶¶ 274–75 & 277–79).

On March 14, 2014, plaintiffs Sharon Otero, Steve L. Pisciotta, and Veronica Escobar[3] initiated the instant action, at which point the PAPD had promoted ninety-six officers through the five published promotional lists. (*Id.* ¶¶ 281–82). Subsequently, defendant Fedorko ordered the promotion of eight additional officers to sergeant. (*Id.* ¶ 283). From April 15, 2014, to March 11, 2015, Plaintiffs claim that twenty-five officers were arbitrarily chosen to be sent for "Sergeant's Supervisory Development Training," of whom nineteen were promoted to sergeant. (*Id.* ¶¶ 284–92). Plaintiffs allege that they were denied the opportunity to attend the training, which had become mandatory in order to be promoted. (*Id.* ¶¶ 294–95). They further allege that the PAPD

---

[3]     As explained in more details below, Plaintiffs initially filed four separate actions and added additional plaintiffs through various amendments. The cases were consolidated into the instant matter on March 27, 2019. (D.E. No. 163).

manipulated and changed the promotional process, which denied Plaintiffs' the opportunity to be promoted.  (*See id.* ¶ 303).

Moreover, on December 20, 2013, before the initiation of the instant action, the PAPD promulgated a horizontal roster for promotion to the rank of lieutenant that contained a list of 26 sergeants ("Lieutenant Horizontal Roster").  (*Id.* ¶¶ 305 & 307).  Twelve sergeants on the Lieutenant Horizontal Roster were promoted to lieutenants, many of whom were promoted to sergeants through the five sets of promotions discussed above.  (*Id.* ¶¶ 309–13).  Plaintiffs allege that because they were denied a fair opportunity to be promoted to the rank of sergeant, they were further denied the opportunity to be promoted to the rank of lieutenant.  (*Id.* ¶¶ 316–17).

### ii.  *The 2015 Announcement and the Second Written Examination*

On March 4, 2015, the PAPD issued a new announcement and established new requirements for promotion to the rank of sergeant.  (*Id.* ¶¶ 318, 322 & 326).  Plaintiffs allege that the new policy was designed to provide unfair advantages to Defendants' favored candidates and to enable Defendants to promote officers based on "political affiliations, associations, and patronage."  (*See id.* ¶¶ 332, 336 & 342–47).  For example, the new policy created a new written test for a new horizontal roster of officers (the "2015 Horizontal Roster").  (*Id.* ¶ 322).  The 2015 Horizontal Roster would supersede the 2010 Horizontal Roster, which, at the time, still had more than 300 officers eligible for promotion, including all Plaintiffs.  (*Id.* ¶¶ 323–24).  In addition, while the policies announced in 2010 mandated random selection of officers from the 2010 Horizontal Roster, the new policy stated that the random selection process would be conducted "at the discretion of the Port Authority," allowing Defendants to promote "whomever [they want] without regard to" the candidates' qualifications.  (*Id.* ¶¶ 333–35).  As another example that Defendants had more discretion under the new policy, Plaintiffs allege that the new policy no

longer mandated a QRM for candidates. (*Id.* ¶ 341). Instead, "only the most competitive candidates will be invited to participate in the QRMs." (*Id.*). For further support that the new policy continued to give unfair advantages to favored candidates, Plaintiffs allege that members of the Academy who drafted the written exam and the relevant training materials also took the 2015 exam. (*Id.* ¶¶ 348–49).

Approximately 700 officers took the exam in 2015, of whom 171 passed and were placed on the 2015 Horizontal Roster. (*Id.* ¶ 362). About 101 officers had their QRMs, of whom 25 received the Highly Recommended rating. (*Id.* ¶¶ 364 & 373–74). Ultimately, 22 officers who received the Highly Recommended rating were promoted to sergeants. (*Id.* ¶ 376). All Plaintiffs were among the 101 officers who passed the exam and had a QRM, but none of them were promoted. (*See id.* ¶ 365). Plaintiffs allege that these promotion decisions were similarly "tainted by cronyism and nepotism, and not on merit," and that favored candidates, such as "those who supported preferred political candidates and/or belonged to preferred political organizations and/or associations," received unfair advantages. (*Id.* ¶¶ 372 & 378; *see also id.* ¶¶ 373–76).

## B.    Procedural Background

On March 14, 2014, plaintiffs Otero, Pisciotta, and Escobar filed the first complaint against Defendants.[4] (D.E. No. 1). On December 3, 2014, plaintiff Reynaldo Mendez filed the second action against defendants Port Authority and Fedorko. (*Mendez v. Port Authority of New York and New Jersey*, No. 14-7543, D.E. No. 1). On May 6, 2016, plaintiff Jesse Turano and eight other plaintiffs filed the third complaint against defendants Port Authority and Fedorko. (*Turano v. Port Authority of New York and New Jersey*, No. 16-2578, D.E. No. 1). Finally, on June 15, 2017,

---

[4]    The initial complaint also included Brian Sullivan as a defendant, who was dismissed on September 2, 2015. (D.E. No. 79).

plaintiff Rosa Rizzo filed the fourth complaint.  (*Rizzo v. Port Authority of New York and New Jersey*, No. 17-4386, D.E. No. 1).  The facts underlying most claims in these four complaints pertain to the common events, described *supra*, surrounding the promotions of PAPD officers to the positions of sergeant and lieutenant from 2011 to 2015.[5]

On March 31, 2017, the Court granted motions to dismiss in *Mendez* and *Turano*, holding that the complaints were deficient in alleging claims of discrimination on the basis of political patronage and common-law fraud.  (*Mendez*, D.E. No. 41; *Turano*, D.E. No. 21).  The *Mendez* plaintiffs and the *Turano* plaintiffs filed their amended complaints on April 27, 2017.  (*Mendez*, D.E. No. 44; *Turano*, D.E. No. 24).  In light of the Court's holdings in *Mendez* and *Turano*, on May 2, 2017, the *Otero* plaintiffs sought leave to file an amended complaint to address the same deficiencies in their complaint.  (D.E. No. 145).  Similarly, on September 29, 2017, the *Rizzo* plaintiffs filed an amended complaint addressing the deficiencies the Court identified in *Mendez* and *Turano*.  (*Rizzo*, D.E. No. 11).  In other words, by September 2017, plaintiffs in all four cases alleged similar factual bases in their respective cases to support their claims of discrimination on the basis of political patronage and common-law fraud.

On December 18, 2017, the Honorable Joseph A. Dickson, U.S.M.J., denied the *Otero* plaintiffs' motion to amend their complaint, holding that their claims of discrimination on the basis of political patronage and common-law fraud were deficient, and that amendment would be futile. (D.E. No. 150 at 10–11 & 15–16).  The Court affirmed Judge Dickson's decision on December 12, 2018.  (D.E. Nos. 152 & 158).  Similarly, on July 10, 2018, the Court granted a motion to

---

[5]     Plaintiff William Kruesi asserts a First Amendment retaliation claim against the Port Authority, alleging retaliation for his protected "speech and/or conduct" as a union delegate.  (SAC ¶¶ 2947–48).  Plaintiff Rizzo brings an Equal Protection claim against Defendants, alleging that she was discriminated against on the basis of "sex/and or sexual orientation" when she was passed over for a promotion in 2015.  (*See id.* ¶¶ 2726–27, 2737 & 2954–59).  The Court will discuss the relevant factual allegations supporting these claims in Sections III(B) and III(C), respectively.

dismiss the amended complaint in *Rizzo*.  (D.E. No. 29).  However, on February 7, 2018, the Court denied motions to dismiss in *Mendez* and *Turano*, holding that the plaintiffs' amended complaints had cured the deficiencies previously identified by the Court.  (*See Mendez*, D.E. No. 55 at 6 & 9; *Turano*, D.E. No. 35 at 6 & 8).  Recognizing that its decisions to allow *Mendez* and *Turano* to proceed may be inconsistent with its decisions to dismiss similar claims in *Otero* and *Rizzo*, on March 27, 2019, the Court consolidated the four actions[6] and ordered Plaintiffs to file "a universal and comprehensive complaint that sets forth their allegations against" Defendants.  (D.E. No. 163).

Plaintiffs filed their consolidated Seventh Amended Complaint on May 17, 2019, asserting claims against Defendants for: (i) violations of their rights to free speech and association protected under the First Amendment (Count I); (ii) violations of their rights to free speech and association protected under the New Jersey Civil Rights Act and the New Jersey Constitution (Count II); (iii) violations of their rights to free speech and association protected under the New York constitution (Count III); and (iv) common law fraud (Count IV).  (*See* SAC ¶¶ 2914–45).  Plaintiff Kruesi further asserts a claim against the Port Authority for First Amendment retaliation (Count V); and plaintiff Rizzo asserts a claim against Defendants for violations of the Equal Protection clause (Count VI).  (*Id.* ¶¶ 2946–60).[7]

---

[6]      The consolidated case does not include plaintiff Otero's claim under the Americans with Disabilities Act, which Defendants did not seek to dismiss, and was severed to "promote the expeditious resolution" and "to prevent any prejudice to her."  (D.E. No. 163 at 3).

[7]      Under Counts I and V, the Seventh Amended Complaint generally asserts claims under 42 U.S.C. § 1983 based on Defendants' violations of "the First and Fourteenth Amendments" of the Constitution.  (SAC ¶¶ 2915 & 2948).  However, the Seventh Amended Complaint also states that the *Otero* plaintiffs' claims under the Fourteenth Amendment "were dismissed by the Court on March 31, 2016," and that, while Plaintiffs intended to preserve such claims, these claims "are not pled here."  (*Id.* ¶ 402).  During the June 9, 2020 hearing, counsel for Plaintiffs admitted that the Seventh Amended Complaint does not assert claims under the Fourteenth Amendment and that, by failing to raise the claims, which the Court previously dismissed without prejudice (D.E. No. 108), Plaintiffs waived any potential claims under the Fourteenth Amendment.  (D.E. No. 188, June 9, 2020 Hearing Tr. ("2020 Hr'g Tr.") at 4:21–6:22).

Defendants filed the Motion on July 12, 2019 (D.E. No. 171; *see also* D.E. No. 171-1 ("Def. Mov. Br.")), to which Plaintiffs opposed (D.E. No. 176 ("Pl. Opp. Br.")).  Defendants filed a reply on September 25, 2019 (D.E. No. 179 ("Def. Reply Br.")); and the Court held an oral argument on June 9, 2020 (D.E. No. 185).

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678*.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and the burden is on the defendant to show that the plaintiff has not stated a facially plausible claim, *see Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

Determining whether there is "a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  "All allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom."  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992).  But a court does not accept as true the complaint's legal conclusions.  *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  In the Third Circuit, courts' inquiry into a Rule 12(b)(6) motion is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing

the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus*, 641 F.3d at 563.

Finally, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case.") (citations and internal quotation marks omitted).

## III.   ANALYSIS

### A.  Freedom of Association and Freedom of Speech Claims

The Court addresses a few preliminary issues.  First, it is unclear whether Plaintiffs allege First Amendment retaliation claims, First Amendment discrimination claims, or both.  Count I of the Seventh Amended Complaint generally claims violations of Plaintiffs' "right to hold employment without infringement of their First Amendment right to freedom of speech and association" and alleges that Defendants engaged in "retaliatory practices" and "discriminatory actions."  (*See, e.g.*, SAC ¶¶ 442–43, 2915 & 2922; *see also id.* ¶¶ 194, 232, 251, 263. 275, 277, 284 & 337 (stating that the promotional processes at issue "favored" promoted officers "and deprived Plaintiff[s] of a fair, unbiased, and transparent promotional process")).  The parties' briefs, however, talk past each other—while Defendants apparently move to dismiss Plaintiffs' First Amendment retaliation claims (Def. Mov. Br. at 8–9), Plaintiffs contend that their First

12

Amendment discrimination claims were properly alleged (Pl. Opp. Br. at 10; *see* 2020 Hr'g Tr. at 11:25–12:18 (counsel for Plaintiffs explaining the alleged claims under First Amendment discrimination claim framework)).  Out of an abundance of caution, the Court assumes that both claims are at issue in this case and applies its analysis equally to both.  *See Montone v. Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013) (explaining that the Third Circuit's jurisprudence on First Amendment discrimination claims based on political association has its roots in case law on First Amendment political association retaliation claims).

Second, the parties disagree, but without acknowledging the disagreement, on the prima facie elements for a § 1983 First Amendment retaliation claim.  Plaintiff Kruesi, the only party who has clearly brought a First Amendment retaliation claim, relies on *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006) and states that he adequately alleged the following elements:  "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  (Pl. Opp. Br. at 24).  Defendants, on the other hand, rely on *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006), which requires that a plaintiff asserting a First Amendment retaliation claim must allege that " (1) his [activity] is protected by the First Amendment and (2) the [activity] was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the [activity] had not occurred." (Def. Mov. Br. at 19–20).

The Third Circuit, in an unpublished opinion in *Falco v. Zimmer*, dealt with a remarkably similar situation to the one present here where the appellant-employee relied on *Hill*, while the appellees-employers relied on *Thomas*.  767 F. App'x 288, 298–99 (3d Cir. 2019).  *Falco* explained

that *Thomas* applies to First Amendment retaliation claims brought against the government by private citizens, while *Hill* applies where, such as here, such claims are brought by public employees. *Id.* ("[O]ur prior decisions demonstrate that [the employee's] articulation of the elements is correct where a First Amendment retaliation claim is brought by a public employee, whereas Appellees' version is appropriate where such a claim is brought by a private citizen."). However, this summary does not seem to be entirely accurate. *See Palardy v. Township of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (applying *Thomas* to claims brought by a public employee); *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (same); *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018) (same); *see Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015) (discussing *Thomas*'s standard on retaliatory action for claims brought by a public employee).

For purposes of this Opinion, the Court does not need to resolve the apparent disagreement. As the Third Circuit recognizes, "both iterations of the elements boil down to similar core considerations." *Falco*, 767 F. App'x at 299. For the reasons explained below, the Court finds that Plaintiffs failed to allege a First Amendment retaliation claim under either standard.

Finally, the Court must address Plaintiffs' contention that there is no distinction between freedom of speech and freedom of association claims. Under Count I of the Seventh Amended Complaint, Plaintiffs generally allege that Defendants' unfair promotional practices and decisions violated their "First Amendment right to freedom of speech and association." (*Id.* ¶ 2915; *see also id.* ¶¶ 2921–22). In other words, Plaintiffs assert freedom of speech and freedom of association claims based on the same underlying alleged facts. In their opposition brief, Plaintiffs also simultaneously rely on case law on freedom of speech claims and cases law on freedom of association claims. (*See, e.g.*, Pl. Opp. Br. at 13). At the oral argument, counsel for Plaintiffs

argued that the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), combined freedom of speech claims with freedom of association claims such that "there is not a distinction anymore so much between speech and association." (2020 Hr'g Tr. at 11:17–19).

The Court disagrees. While *Rutan* generally discussed employment decisions based on party affiliation and support, as well as the burden the practice places on free speech and association, the Supreme Court did not combine freedom of speech claims and freedom of association claims, or hold that the two causes of action were synonymous to each other in the employment context. *See* 497 U.S. at 76–79. Nor has the Third Circuit understood that to be the case. In *Palardy*, a plaintiff alleged both speech and association claims based purely on his union membership, and the Third Circuit specifically stated that the district court should have analyzed Palardy's speech and association claims separately. 906 F.3d at 81; *see also Baloga v. Pittston Area School Dist.*, 927 F.3d 742, 748–49 ("[W]here a public employee asserts retaliation in violation of the First Amendment as a free speech claim and a pure union association claim, those claims must be analyzed separately. . . ." (citing *Palardy*, 906 F.3d at 80–81 & 83)).

Accordingly, the Court follows this approach here and analyzes the claims separately even though the facts underlying the claims are common: Plaintiffs allege that Defendants gave preference in the promotional process to candidates who "supported the preferred political candidates, were associated with preferred political candidates, or belonged to preferred political organizations and/or associations." (SAC ¶ 134; *see also* Pl. Opp. Br. at 15). Because Plaintiffs were actually, or perceived by Defendants as, "apolitical" and/or "not being sufficiently supportive of favored political candidates and organizations," Plaintiffs allege they were discriminated and retaliated against on the basis of their speech and/or association (or lack thereof) in the 2010 and

2015 promotions processes, which led to the denial of further opportunities to be promoted to the rank of lieutenant.  (SAC ¶¶ 136–37, 305–17, 387–88 & 2916–2922).

A comprehensive list of promoted officers who allegedly were political or had certain political associations are summarized below:

- Of the fourteen police officers who were promoted on July 8, 2011, Plaintiffs allege that:
    - "Daniel McCabe's family owns McCabe Ambulance Service, which does business with various local municipalities and law enforcement agencies."  (SAC ¶ 147).
    - "Scot Pomerantz is the president of the Shomrim Society, an organization for Jewish police officers."  (*Id.* ¶ 151).

- Of the thirteen police officers who were promoted on January 23, 2013, Plaintiffs allege that:
    - "Luis Mancuso has ties to Lt. Macaluso, the treasurer of the Lieutenant's Benevolent Association (LBA), and Jeff Baumbeck, who is the head of the LBA."  (*Id.* ¶ 143).
    - "Arelys Matos was associated with NJ Senator Menendez."  (*Id.* ¶ 145).
    - "Robert Zafonte's father was a retired NYPD officer, was president of the East Meadow Civic and Community Service Organization, and chief investigator for the Town of Hempstead, and is otherwise connected with the Nassau County Republican Party."  (*Id.* ¶ 148).

- Twenty-nine officers were promoted to sergeant on July 29, 2013.  (*Id.* ¶ 262).  Plaintiffs allege the following political associations:
    - "Michael Kennedy is the son of Thomas Kennedy, retired police office[r] and Hoboken councilman."  (*Id.* ¶ 150).
    - Officers Robert Coccodrilli and Georgeos Masouridis, who were Fedorko's driver, were promoted without being on the 60 randomly selected list and without going through the QRM.  Instead, they were promoted by Fedorko in September 2011 and were demoted by the PAPD due to the impropriety of the promotions.  They were promoted again in July 2013.  (*Id.* ¶¶ 234–37).
    - "James Flanigan's father in law [sic] is retired PAPD Lt. William Corrigan; Flanigan's wife is a police officer with

> the NJ Regional Operational Intel. Center, and Flanigan's brother-in-law is a police officer who is a driver at police headquarters." (*Id.* ¶ 154).
>
> ○ "Richardo Kuncken is the son of Dian Kuncken, mayor of Stanhope, NJ." (*Id.* ¶ 149).
>
> ○ Aaron Woody is the president of "Bi-state Coalition" fraternal organization; and Lance Harrison is a member of the organization. (*Id.* ¶¶ 152 & 158).

- Of the twenty-seven officers promoted on December 23, 2013, Plaintiffs allege the following political associations:

  - ○ "Brian Boel's father-in-law was the Chief of North Bergen Police Department." (*Id.* ¶155).

  - ○ "Sean Dale's father is a retired NYPD chief and former commissioner of the Nassau County Police Dept." (*Id.* ¶ 153).

  - ○ "Kevin Gormley's wife works for Congressman Peter King." (*Id.* ¶ 142).

  - ○ "Leticia Perez is friends with NJ State Senator M. Teresa Ruiz." (*Id.* ¶ 146).

- On February 7, 2014, thirteen officers were promoted to the rank of Sergeant. (*Id.* ¶ 276). Plaintiffs allege that Jordan Esposito, John Garrone, and John Rice are delegates of the local Police Benevolent Association ("PBA"), which is a police union representing police officers.[8] (*Id.* ¶ 156).

- Finally, of the twenty-two officers who were promoted on December 15, 2015, Plaintiffs allege that "Lisa Orlando is the niece of Frank Orlando, the head of the [New York State] insurance fraud division" (*id.* ¶ 159) and "Officer Albin [is] former Port Authority Police Chief's son" (*id.* ¶ 379).

The fact that these individuals were promoted, and Plaintiffs were not, along with other allegedly

unfair and unlawful practices in the promotion process, forms the basis of Plaintiffs' claims that

they were discriminated and retaliated against because they did not have similar "speech and/or

association."

---

[8]    Plaintiffs allege that "[a] disproportionate number of [PBA] delegates were promoted" and identified Jordan Esposito, John Garrone, John Rice, Pat Monihan, Mike Scivetti, and Ray Butler as PBA delegates who were inappropriately promoted. (SAC ¶ 156). The Seventh Amended Complaint, however, does not allege that officers Pat Monihan, Mike Scivetti, and Ray Butler were promoted during the relevant time of this case.

i.   *Speech Claim*

Although the Court must analyze Plaintiffs' speech and association claims separately, where, as here, the same facts form the basis of both claims, the Court must determine whether the speech claims are co-extensive with the association claims and therefore must be dismissed.  Such is the case here.  In *Palardy*, the Third Circuit found that Palardy "did not adequately plead a freestanding speech claim" because he did not allege that the defendant "retaliated against him because of his speech or advocacy on any particular issue." 906 F.3d at 84.  Instead, the retaliation, as asserted, was because "he was a union man."  *Id.*.  The Court therefore found that Palardy's free speech claim should be dismissed because it was "co-extensive with his associational claim."  *Id.*

Similarly here, Plaintiffs do not allege that the promoted officers engaged in any speech or advocacy that Plaintiffs did not participate in, for which Plaintiffs were discriminated and retaliated against in the promotion process.  The political activities that Plaintiffs allege that they had the right not to participate in were purely associational—the association with political figures and organizations.  (*See* SAC ¶ 134; Pl. Opp. Br. at 14 ("Plaintiff need not identify a specific supported party.  Rather, those who supported or were supported by political candidates or associations were given a preference in promotion, and this alone is sufficient.")).  Plaintiffs go further and argue that their claims that "certain officers were favored over others does not turn on *party* affiliation, but rather political affiliation and union affiliation more broadly."  (Pl. Opp. Br. at 13 (emphasis in original)).  In other words, the specific political interests of the various political figures and associations were irrelevant to Plaintiffs' First Amendment claims, and the claims are merely that Defendants' favoritism boiled down whether the candidates had *any* political affiliation.  But such a claim is what the Third Circuit has identified as the dichotomy characterizing a pure association claim.  *See Palardy*, 906 F.3d at 83 ("[U]nion-related speech is

different than mere union membership.  Because labor unions advocate for their employees on a wide range of issues, the number of possible subjects for union-related speech is similarly wide-ranging.  Conversely, union membership is a dichotomy—either an employee is a union member, or he is not.").  The Court thus finds that Plaintiffs' First Amendment speech claims are entirely co-extensive with their association claims and must be dismissed.  *See Palardy*, 906 F.3d at 79 (holding that the plaintiff's "speech claim must fail because it is indistinguishable from his associational claim").

ii.   *Association Claim*

To assert a claim of discrimination based on political association in violation of the First Amendment, a plaintiff must allege that "(i) [he] was employed at a public agency in a position that does not require political affiliation; (ii) [he] engaged in constitutionally protected conduct; and (iii) this conduct was a substantial or motivating factor in the [public employer's] employment decision."  *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007).  To assert a First Amendment retaliation claim, as the Court discussed above, a plaintiff must allege the relevant elements delineated in *Thomas* or *Hill.  See Thomas*, 463 F.3d at 296; *Hill*, 455 F.3d at 241.  Under either test, Plaintiffs must allege that they were engaged in constitutionally protected activities, and that such activities caused the retaliatory conduct.  *See Thomas*, 463 F.3d at 296; *Hill*, 455 F.3d at 241.  Where a retaliation claim is based on a plaintiff's "status as a union affiliate and not any particular speech on behalf of the union," such union membership is constitutionally protected.  *Baloga*, 927 F.3d at 754; *see Palardy*, 906 F. 3d at 84.

Plaintiffs allege that Defendants favor "certain employees known to support certain political organizations or candidates."  (Pl. Opp. Br. at 15).  Yet the majority of the allegations pertaining to "political associations" and "political patronages" amount to nothing more than

allegations that the persons who got promoted knew someone, often a relative or a friend, who was a political figure or person of power.  Plaintiffs have pointed to no legal authority to support this theory of "political association," and the Court has found no Third Circuit case directly on point. Other Courts of Appeals, however, have held that nepotism alone does not raise First Amendment concerns.  This is because "mere personal association without political overtones does not implicate First Amendment concerns, and the burden of proof is on the plaintiff to demonstrate that her association was political and not personal."  *Barry v. Moran*, 661 F.3d 696, 704 (1st Cir. 2011) (citations and internal quotation marks omitted).

In particular, the First Circuit has explained the following:

> [T]he simple fact that one is a friend or relative of a powerful person does not create a political association implicating First Amendment concerns.  There is an important distinction between a public official who chooses to hire friends, relatives, neighbors or college buddies, and one who refuses to hire those who failed to make campaign contributions, join her political party or attend political rallies. Although the first public official may be practicing bad policy, she is not practicing political affiliation discrimination that violates First Amendment rights.  To ignore this distinction is to "constitutionalize the employee grievance" generally.

*Id.* at 708 (internal citations omitted); *see also Boger v. Wayne Cty.*, 950 F.2d 316, 323 (6th Cir. 1991) (declining to hold that the plaintiff's "personal alliance" with county medical examiner embroiled in conflict with the employer was protected as a political affiliation and stating that the plaintiff's "'affiliation' with Dr. Spitz, as alleged, does not involve her belief on matters of public concern or an affiliation with Dr. Spitz to advance those beliefs, but rather simply a personal alliance with respect to personality conflicts and social friction" (internal citations omitted)). Similarly, district courts within the Third Circuit have held that merely being related to a political figure is "insufficient to constitute protected political activity."  *Best v. Hous. Auth.*, 61 F. Supp. 3d 465, 472, n.10 (D.N.J. 2014); *see also Oliver v. Rhynhart*, No. 18-279, 2019 WL 3943458, at

*12 (E.D. Pa. Aug. 21, 2019) ("[T]he Court is not persuaded that an individual engages in constitutionally protected political conduct simply by virtue of being related to someone who engages in constitutionally protected political conduct.").

As described *supra*, the majority of the alleged "political associations" of the promoted officers are indeed personal affiliations.  For example, Plaintiffs allege that ""Kevin Gormley's wife works for Congressman Peter King"; "Leticia Perez is friends with NJ State Senator M. Teresa Ruiz"; "Daniel McCabe's family owns McCabe Ambulance Service, which does business with various local municipalities and law enforcement agencies;" "Arelys Matos was associated with NJ Senator Menendez;" and "Michael Kennedy is the son of Thomas Kennedy, retired police office and Hoboken councilman." (*Id.* ¶¶ 142, 145–147 & 150).  Notwithstanding the conclusory and unspecified nature of some of these alleged affiliations, nothing in the Seventh Amended Complaint suggests that these affiliations have any political overtone or that they amount to more than allegations that "one is a friend or relative of a powerful person." *See Barry*, 661 F.3d at 708. The Court thus finds that the majority of the allegations do not support the reasonable inference that Plaintiffs, or the promoted officers, engaged in constitutionally protected conduct implicating the First Amendment.

The only allegations that potentially implicate protected activities under the First Amendment are those involving the promoted officers' membership in public organizations.  The entirety of these allegations are:  "Scot Pomerantz is the president of the Shomrim Society, an organization for Jewish police officers" (SAC ¶ 151); Aaron Woody is the president of Bi-state Coalition Fraternal Organization, and Lance Harrison is a member of the organization (*id.* ¶¶ 152 & 158); Jordan Esposito, John Garrone, and John Rice are delegates of the local Police Benevolent

Association (*id.* ¶ 156); and unspecified officers were members of the Asian Jade Society (*id.* ¶ 157).

With the exception of the Police Benevolent Association, which is a police union, it is unclear if membership in these organizations "is always a matter of public concern" like union membership.   But even assuming associations with these organizations satisfies the "constitutionally protected activity" requirement, the Seventh Amended Complaint still fails to sufficiently allege that Plaintiffs' non-association with any similar organizations was a substantial or motivating factor that caused the denial of their promotions.  *See Elrod v. Burns*, 427 U.S. 347, 350 (1976); *Galli*, 490 F.3d at 272–74; *Thomas*, 463 F. 3d at 296; *Hill*, 455 F.3d at 241.

Plaintiffs merely plead that six out of more than 100 officers who were promoted from 2010 to 2015 were associated with certain public organizations, which, without more, is insufficient to allow any plausible inference that Defendants engaged in a "pattern of making politically influenced promotions."  (*See* SAC ¶ 319).  Moreover, it is true that "the right not to have allegiance to the official or party in power itself is protected under the First Amendment." *Galli*, 490 F.3d at 272 (citing *Branti v. Finkel*, 445 U.S. 507, 519 (1980).  However, "[m]erely juxtaposing a protected characteristic—someone else's politics—with the fact that plaintiff was treated unfairly is not enough to state a constitutional claim."  *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 58 (1st Cir. 1990), *overruled by Educadores Puertorriqueños en Acción v. Hernandez*, 367 F.3d 61 (1st Cir. 2004), *on other grounds*.  Rather, sufficient facts must be alleged to establish that there is a causal connection linking Plaintiffs' political convictions, or the lack thereof, and Defendants' conduct.  For example, Plaintiffs do not allege any facts to raise a plausible inference that Defendants had any reason to know or think that Plaintiffs were apolitical. *See Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002) ("Implicit in the

third prong is a requirement that the plaintiff produce sufficient evidence to show the defendant knew of plaintiff's political persuasion.").

In sum, Plaintiffs' failure to plead facts sufficient to infer that the other officers' promotions were motived by their political association, coupled with their failure to sufficiently allege that Defendants treated Plaintiffs unfairly or retaliated against them *because of* their lack of political associations is fatal to Plaintiffs' First Amendment Association claim.  The Court thus dismisses Count I of the Seventh Amended Complaint in its entirety.

### B.     Kruesi

Plaintiff Kruesi brings a claim under § 1983 for First Amendment retaliation against the Port Authority alleging retaliation for protected "speech and/or conduct" from when he was a union delegate.  (SAC ¶¶ 2947–48).  Kruesi has been employed by the Port Authority as a police officer continuously since May of 2002, and he was a union delegate from 2006 to 2009.  (*Id.* ¶¶ 2253 & 2274).  In that capacity, he allegedly "engaged in union activities, including activities pertaining to the rights of his fellow officers and misconduct of superior officers," and "disagreed with and opposed the conduct of Lt. Rick Munnelly."  (*Id.* ¶¶ 2274–77).  Kruesi alleges that due to these activities, he was retaliated against in 2011, when Lt. Munnelly issued him a write-up for being late to a post by fifteen minutes.  (*Id.* ¶¶ 2286–87).  While he does not dispute that he was indeed late for his post, Kruesi alleges that this type of infraction typically did not rise to the disciplinary level of a write-up.  (*Id.* ¶ 2288).  Kruesi alleges that this disciplinary action was retaliation against him for engaging in "union activities as union delegate" and was intended to disqualify him from consideration for promotion.  (*Id.* ¶ 2287).

**i.** *Constitutionally Protected Conduct*

As discussed above, to state a First Amendment retaliation claim, a plaintiffs must allege that he was engaged in constitutionally protected activities, and such activities caused the retaliatory conduct. *See Thomas*, 463 F.3d at 296; *Hill*, 455 F.3d at 241.  A public employee's speech is "protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Hill*, 455 F.3d at 241–42 (internal quotations omitted) (citing *Garcetti*, 547 U.S. 410, 418 (2006)).

The relevant issue here is whether Kruesi sufficiently alleged that his speech is of public concern.  Speech is of public concern if it "generally addresses a social or political concern of the community," implicating significant First Amendment concerns. *Borden v. Sch. Dist. of the Twp. of East Brunswick*, 523 F.3d 153, 169–70 (3d Cir. 2008).  To decide whether speech is of public or private concern, courts "focus on the content, form, and context of the activity in question." *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001).  In this regard, "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, 453–54 (2011).  For example, courts have held speech was of public concern where it involved funding of public programs, government corruption, or the lowering of academic standards and its effects. *Borden*, 523 F.3d at 170.  In contrast, "a public employee's internal complaint is not protected by the First Amendment where there is no evidence in the record that the employee even made a public statement, and there is no proof that he thought any public policy issues were at stake." *Emigh v.*

*Steffee*, 442 F. App'x 660, 665 (3d Cir. 2011) (affirming dismissal of § 1983 retaliation claim where plaintiff did not show internal complaint was intended to be made public).

In support of the argument that his union activities are constitutionally protected activities, Kruesi extensively relies on cases holding that union association is protected under the First Amendment.  (Pl. Opp. Br. at 25; *id.* at 25 n.3).  To be clear, Kruesi does not assert a First Amendment retaliation claim based merely on *his association* with the union.  Indeed, he joins the remaining plaintiffs and claims that he was discriminated and retaliated against because he lacked political association and his employer favored officers who had political associations, including affiliations with the same union he was a member of.  (SAC ¶¶ 134–141, 156; 2020 Hr'g Tr. at 14:9–12 (counsel for Kruesi stating "[i]t's two causes of action for him.  One, based on *union activity* and retaliation; and two, based on the fact of his *lack of political association* as all other plaintiffs")).  Instead, the constitutionally protected conduct that forms the basis of Kruesi's individual retaliation claim was speech and activities he engaged in as a union delegate.  (*See* SAC ¶ 2947 ("Kruesi engaged in speech and/or conduct protected by the First Amendment of the United States")).  As discussed above, unlike with a First Amendment retaliation claim based on union-related speech, where courts must determine whether the plaintiff acted as a private citizen and spoke out on a matter of public concern, no such analysis is necessary for pure association claims. *See Palardy*, 906 F.3d at 84; *Baloga*, 927 F.3d at 754.  Kruesi's reliance on case law regarding union association to support that his union activities were constitutionally protected is thus misplaced.

The Seventh Amended Complaint is bereft of facts regarding "the content, form, and context of a given statement," preventing the Court from making the reasonable inference that Kruesi spoke on a matter of public concern.  *See Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

Kruesi merely alleges that he was a union delegate from 2006 to 2009, that he "engaged in union activities, including activities pertaining to the rights of his fellow officers and misconduct of superior officers," and that he "disagreed with and opposed the conduct of Lt. Rick Munnelly." (SAC ¶¶ 2274–77). Nothing in the Seventh Amended Complaint indicates that any public policy issues were at stake, let alone speech "important to our system of self-government." *See Emigh*, 442 F. App'x at 665; *Thomas v. Delaware State Univ.*, 626 F. App'x. 384, 388–89 (3d Cir. 2015).

In his opposition brief, Kruesi alleges for the first time that the relevant protected activity for this First Amendment retaliation claim was his filing of grievances against Lt. Munelley. (Pl. Opp. Br. at 25). At the oral argument, counsel for Plaintiffs seemingly argued that Kruesi's filing of grievances was a categorically protected activity. (*See* Pl. Opp. Br. at 25; 2020 Hr'g Tr. 17:16–18:5; 20:18–21:4; 21:20–22:6 ("Mr. Frost: The constitutionally protected conduct, Judge, what I was saying was the filing of grievances. I'm saying that that does not become actionable unless he is retaliated against.")). However, a plaintiff cannot amend the complaint through briefing. *See Pennsylvania ex rel. v. Zimmerman v. Pepsico*, 836 F.2d 173, 181 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *see also Frederico v. Home Depot*, 507 F.3d 188, 201–02 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of her complaint under Rules 9(b) and 12(b)(6).").

And, in any event, filing grievances is not per se protected activity. *See Borough of Duryea, Pa. v.* Guarnie, 564 U.S. 379, 387 (2011). Union grievances are still subject to the public concern test established in *Connick* and its progeny. *Id.* To this end, union grievances relating to "working conditions and other issues in union members' employment" have been held not to involve a public concern as they are not relevant to "issues of interest to the broader community." *See, e.g.,*

*Thomas*, 626 F. App'x. at 388–89; *see also Garcia v. Newtown Twp.*, 483 F. App'x. 697, 703 (3d Cir. 2012) ("[I]nternal workplace matters and personal grievances . . . clearly fall outside the sphere of First Amendment protection.").  Indeed, the limited factual allegations in the Seventh Amended Complaint suggest that the activities at issue—those being—"activities pertaining to the rights of [Kruesi's] fellow officers and misconduct of superior officers" (SAC ¶ 2275)—are more akin to "internal workplace matters and personal grievances" than issues of societal value. *See Garcia*, 483 F. App'x at 703.

Accordingly, even with the Court making all reasonable inferences favorable to Plaintiff, as it must at the motion to dismiss stage, the Seventh Amended Complaint simply fails to sufficiently allege that Kruesi spoke on a matter of public concern.  Kruesi's claim should be dismissed for this reason alone.  But as will be discussed next, Kruesi also fails to show the second element required in a public employee's § 1983 First Amendment retaliation claim—that the activity was a substantial or motivating factor in the alleged retaliatory action. *See Falco*, 767 F. App'x at 299.

### ii.   *Causation*

To show that the protected activity was a substantial or motivating factor in the retaliatory act, a plaintiff must show a "causal link" between the protected activity and the retaliatory action. *Hammond v. City of Wilkes Barre*, 628 F. App'x 806, 807 (3d Cir. 2015).  This can be shown by a "suggestive temporal proximity between the protected activity and the alleged retaliatory action." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).  "[T]he timing of the retaliatory action must be 'unusually suggestive' of retaliatory motive." *Hammond*, 628 F. App'x at 808. More specifically, the "temporal proximity contemplated to allow for such an inference is on the

order of days or weeks." *Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 134 (3d Cir. 2017).

A causal link can also be shown by "a pattern of antagonism coupled with timing." *Falco*, 767 F. App'x at 313 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). To show this, there must be "actual antagonistic conduct or animus" in "the intervening period" between the protected activity and the retaliation. *Kriss v. Fayette Cty.*, 504 F. App'x 182, 188 (3d Cir. 2012). Finally, causation may also be shown "from the evidence gleaned from the record as a whole." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016).

Kruesi served as a union delegate from 2006 to 2009. (SAC ¶ 2274). He alleges that due to his advocacy on behalf of his fellow officers, he was retaliated against in 2011, when Lt. Munnelly issued him a write-up intended to disqualify him from consideration for promotion. (*Id.* ¶¶ 2286–87). Even assuming that Kruesi's union activities were protected under the Constitution, the temporal gap between those activities and the alleged retaliation is at least two years. The Third Circuit has never found such a lengthy temporal gap indicative of a causal link and has; in point of fact, rejected far shorter temporal gaps as being suggestive of causation. *See e.g. Pollock v. The City of Phila.*, 403 F. App'x 664, 668 (3d Cir. 2010) (finding a six-week temporal proximity was not indicative of a causal link); *Hammonton*, 351 F.3d at 114 (finding a three-week temporal proximity not probative of causation). Kruesi has not shown "an unusually suggestive temporal proximity" with the Seventh Amended Complaint's two-year temporal gap alone to satisfy the causal link element. *DeFlaminis*, 480 F.3d at 267.

During the June 9, 2020 oral argument, counsel for Kruesi argued that, despite the two-year temporal gap, the Seventh Amended Complaint sufficiently pleaded a causal link because "the promotional process [ ] did not begin until 2011." (2020 Hr'g Tr. at 22:15–16). In other

words, Kruesi appears to argue that Lt. Munnelly's first chance to retaliate against him came two years after he stopped being a union delegate. However, Kruesi still fails to allege any "actual antagonistic conduct or animus" during the intervening period, and an isolated event occurring two years after the alleged protected activity is insufficient to support the causal linkage. *Kriss*, 504 F. App'x at 188. Kruesi therefore fails to plead this element because he has not plausibly shown unusually suggestive temporal proximity, or a pattern of antagonism coupled with timing.

Because Plaintiff fails to plausibly allege both elements for a First Amendment retaliation claim brought by a public employee, Count V of the Seventh Amended Complaint is dismissed.

### C.    Rizzo

Plaintiff Rosa Rizzo brings an additional § 1983 equal protection claim against Defendants, alleging that she was discriminated against based on "sex and/or sexual orientation" when she was passed over for a promotion in 2015. (*See* SAC. ¶¶ 2726–27, 2737 & 2954–58). Rizzo has been employed as a police officer with the Port Authority since August of 2007. (*Id.* ¶ 2695). She holds a Bachelor of Science degree, an MBA, and a master's degree in Administration & Supervision, all from St. John's University. (*Id.* ¶ 2697). Before joining the PAPD, she was a private investigator for a New York company for approximately ten years, and she was also an Assistant Dean and an Adjunct Professor at St. John's University. (*Id.* ¶¶ 2696–97). In her professional capacity, Rizzo received various awards, including a Blue and White Excellent Police Duty Breast Bar. (*Id.* ¶¶ 2699–700). Rizzo was one of 101 officers who did well enough in the 2015 written examination to proceed to the QRMs stage. (*Id.* ¶¶ 2695 & 2710–11). However, she received a "needs development" rating for her QRM, which was the lowest score at this stage, and she was not promoted as a result. (*Id.* ¶ 2727).

Rizzo alleges that she was only disqualified because of her sexual orientation.  (*See id.* ¶¶ 2728–29 & 2743).  Allegedly, Rizzo received the rating of "recommended" from her supervisor, which was the highest rating available; a "fully competent" score on attendance, and "outstanding" in each of the Discipline, Complaints, and Investigations categories.  (*Id.* ¶¶ 2707 & 2730).  Rizzo alleges that her QRM score "was the sole factor" that prevented her from being promoted, and that Defendants manipulated the QRM score to "exclude individuals whom Defendants did not want to promote."  (*Id.* ¶¶ 2729 & 2731).  Specifically, Rizzo alleges that she received a letter dated December 4, 2015, informing her that she was not recommended for promotion and that she received a "needs development" score on her QRM.  (*Id.* ¶ 2727).  After receiving this letter, she heard a phone call between her supervising captain, Captain Richard Gutch, and Captain Yablonsky, who was one of her QRM interviewers, where Captain Yablonsky told Captain Gutch that Rizzo had done "very well" in her QRM and sounded surprised that Rizzo failed the QRM.  (*Id.* ¶ 2728).  On December 11, 2015, Rizzo spoke to defendant Michael Ford regarding her promotion, and Ford told Rizzo that feedback from her QRM indicated that Rizzo "needed to develop her public speaking skills," which was the reason she failed the QRM.  (*Id.* ¶¶ 2733–34).  Rizzo, who allegedly "taught courses at the [A]cademy, [had] given presentations repeatedly, and even served as a college professor previously," alleges that the comment about her public speaking skills was "pretext to not promote" her.  (*Id.* ¶ 2735).  When Rizzo confronted Ford with "her extraordinary breadth of experience in public speaking," Ford allegedly "had no response," which, according to Rizzo, indicates that Ford "tacitly [admitted] that [Rizzo's] QRM rating was not actually due to her public speaking" skill.  (*Id.* ¶ 2736).

Rizzo further alleges that, prior to the 2015 promotional process, she was "repeatedly and falsely accused of engaging in a sexual relationship with another female PAPD officer" and that

"rumors of Plaintiff engaging in sexual relationships with various female PAPD officers persisted and were rampant in the PAPD." (*Id.* ¶¶ 2738–39). After Rizzo was denied the promotion, Lauren Previte, who was then a sergeant in the PAPD, told Rizzo that Rizzo's sexual orientation had negatively affected her chances at promotion. (*See id.* ¶¶ 2744–46). In addition, Assistant Chief Norma Hardy allegedly told Rizzo that "upstairs" and "the brass" would not promote Rizzo because she is "gay." (*Id.* ¶ 2745). Hardy also allegedly told Rizzo that Hardy "had overheard multiple officers in headquarters openly discussing how [Rizzo] was not promoted because of her sexual orientation." (*Id.* ¶ 2746). Rizzo asserts that "upstairs" and "the brass" that made the promotion decision was Fedorko and the Port Authority administration, which enforced a policy to discriminate against "gay and /or lesbian officers" in the promotional process, the result of which was that "there [was] only one gay female officer ranked as Sergeant or above, among the hundreds of superior officers in the PAPD." (*Id.* ¶¶ 2745 & 2750–51). In addition, Rizzo alleges that, she and another homosexual female officer were repeatedly given undesirable assignments and posts in a matter contrary to the PAPD's practice of assigning posts based on seniority. (*Id.* ¶ 2748). Finally, Rizzo alleges that she applied for a position as a detective but was denied an interview, which further shows the PAPD's policy and custom of not promoting openly homosexual officers. (*Id.* ¶ 2759).

In their motion to dismiss, Defendants argue that the Seventh Amended Complaint fails to allege any facts to support that Fedorko and Ford knew of or acquiesced to any alleged discrimination based on sexual orientation. (Def. Mov. Br. at 26–28). Defendants further argue that the individual defendants are shielded from "any equal protection claim" by qualified immunity. (*Id.* at 31–32). Accordingly, Defendants seek to dismiss Rizzo's claims asserted

against the individual defendants, as well as her *Monell* claim against the Port Authority.  (*Id.* at 26–28).

### i.   *Equal Protection Claim*

As an initial matter, the Court notes that it is unclear what protected class is allegedly at issue in this case.  Throughout the Seventh Amended Complaint, Rizzo repeatedly alleges that the Port Authority maintains a practice of discriminating against "gay *and/or* lesbian officers."  (*See* SAC ¶¶ 2750 & 2752 (emphasis added)).  Her opposition brief also states that "the denial of [Rizzo's] promotion was to discriminate against her by Defendants due to her sex *and/or* sexual orientation."  (Pl. Opp. Br. at 27 (emphasis added)).  One reasonable reading of these allegations is that the alleged discrimination was based on sexual orientation, as well as sex.  Under this reading, Rizzo essentially alleges that she received different treatment compared to heterosexual individuals and compared to her fellow male homosexual officers.  Yet the other reasonable reading of Rizzo's allegations is that the alleged discrimination was based on sexual orientation only, regardless of the officers' sex.  That is, male and female homosexual officers were allegedly treated differently as compared to their heterosexual colleagues.  During the oral argument held on July 10, 2018, regarding a prior motion to dismiss, counsel for Rizzo represented to the Court that Rizzo's discrimination claim was "for discrimination based on sexual orientation" only, and that her claim was not based on sex "to the extent [that] it is separate from the sexual orientation clam."  (*Rizzo*, D.E. No. 44, July 10, 2018 Hearing Tr. at 41:7–8 & 15–16).  Given the language in the Seventh Amended Complaint, however, and out of an abundance of caution, the Court addresses both theories of the Equal Protection claim and finds that, under each theory, Rizzo's claim fails.

To state a § 1983 claim under the Equal Protection Clause, a plaintiff must demonstrate

purposeful discrimination by showing that (1) they received different treatment than other similarly situated persons, and (2) that the disparate treatment was based on their protected class status. *See Kasper v. Cnty. of Bucks*, 514 F. App'x 210, 214 (3d Cir. 2013) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990)).

To the extent that Rizzo claims that the Port Authority discriminates against her because of her sexual orientation, the parties do not dispute that the Supreme Court has not explicitly recognized sexual orientation as a suspect class. (*See* Def. Mov. Br. at 31–33; *see generally* Pl. Opp. Br. at 26–33; 2020 Hr'g Tr. at 36:19–37:3 (counsel for Rizzo admitting that there was no legal support cited in her opposition brief)). Rizzo thus fails to assert that she belonged to a protected class.

In any event, even if Rizzo had properly stated a claim under the Equal Protection Clause, qualified immunity would have applied and shielded Defendants from such claim. Qualified immunity, when applicable, insulates government officials from the burdens of litigation and civil liability. *Walter v. Pike County*, 544 F.3d 182, 190 (3d Cir. 2008). In determining the applicability of qualified immunity, a court must determine (i) whether the alleged facts demonstrate a violation of a constitutional right and (ii) whether that right was "clearly established at the time of [a] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotations omitted). While qualified immunity shields government officials from claims unless both prongs are met, courts may address them in any order. *Id.* at 239–40. "For a right to be *clearly established*, 'there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 762 (3d Cir. 2019) (quoting

*Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)) (emphasis added).

As alleged in the Seventh Amended Complaint and construed in the light most favorable to Rizzo, the violations against Rizzo occurred from approximately 2012, when she just joined the PAPD and was assigned to undesirable posts at Lincoln Tunnel, through the beginning of 2017, when she was denied an interview for a Detective position.  (*See* SAC ¶¶ 2701, 2748 & 2759).  It is undisputed that, at the time of Defendants' alleged misconduct, neither the Supreme Court nor the Third Circuit had held, let alone "clearly established," that people who identify themselves as homosexual were a federally protected class.  (*See* Def. Mov. Br. at 31–33; *see generally* Pl. Opp. Br. at 26–33; 2020 Hr'g Tr. at 37:1–2); *see also Pagan v. Gonzalez*, 430 F. App'x 170, 171–72 (3d Cir. 2011) (affirming summary judgement where district court found "discrimination based on a failure to conform to gender stereotypes is cognizable, discrimination based on sexual orientation is not.").  Moreover, even as of this writing, neither the Supreme Court nor the Third Circuit has recognized people who are homosexual as a protected class under the Equal Protection Clause.

Subsequent to the oral argument on the instant Motion, Rizzo filed a letter with supplemental authority arguing that the Supreme Court's recent decision in *Bostock v. Clayton Co., GA.*, 140 S. Ct. 1731 (2020) supports her position that sexual orientation is a protected class. (D.E No. 186 at 1).  Preliminarily, this recent case is irrelevant to the question of whether the constitutional right at issue was clearly established *at the time of Defendants' alleged misconduct*. *See Pearson*, 555 U.S. at 232.  Even if the decision did exist at the time of Defendants' misconduct, however, it would not change the Court's conclusion.  *Bostock* interpreted the prohibition of discrimination under Title VII of the Civil Rights Act of 1964.  *See Bostock*, 140 S. Ct. at 1754. Nevertheless, the Court recognizes that "[a] plaintiff need not show that the very action in question

34

has previously been held unlawful, but needs to show that in light of preexisting law the unlawfulness was apparent." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001). Yet Rizzo still fails to establish that *Bostock*, without more, clearly established that sextual orientation is a protected class under the Equal Protection Clause such that discrimination based on one's sexual orientation is clear violation of the Constitution.

Alternatively, to the extent that Rizzo alleges that she was discriminated against because of her sexual orientation and her sex, or that she was somehow discriminated against compared to her male homosexual colleagues, Rizzo fails to sufficiently allege that similarly situated officers who were not part of a protected class were treated differently. (*See generally* SAC). To survive a motion to dismiss, the plaintiff must provide specific allegations identifying similarly situated parties and instances in which they were or were not treated differently from the plaintiff. *See id.*; *see also Kasper*, 514 F. App'x at 214–15; *Kazar v. Slippery Rock Univ. of Pennsylvania*, 679 F. App'x 156, 162 (3d Cir. 2017) ("[Plaintiff's] claim fails because [plaintiff] has not identified similarly situated individuals."). The Seventh Amended Complaint states that 101 officers, including Rizzo, proceeded to the QRM stage. (SAC ¶ 2710). Fifty officers were put on a highly recommended list and an unspecified number of officers were put on a "recommended" list, of whom twenty-two were ultimately promoted. (*Id.* ¶¶ 373–76). Nowhere in the 300-plus-page Seventh Amended Complaint does Rizzo fill in the details regarding these officers' qualifications; nor does Rizzo allege any facts regarding these officers' sexual orientation. This deficiency is fatal to Rizzo's claim because "[a]bsent specific allegations as to the allegedly similarly situated parties, [plaintiff] has not made plausible the conclusion that those parties exist and that they are like [plaintiff] in all relevant aspects." *Vurimindi v. City of Phila.*, 521 F. App'x 62, 66 (3d Cir. 2013); *see also Wilson v. Altman*, 807 F. App'x 172, 177 (3d Cir. 2020) (affirming dismissal of

equal protection claim where plaintiff failed to identify similarly situated individuals).  Because the Court cannot make the reasonable inference that the officers who received better QRM scores and were promoted were similarly situated but were favorably treated because of their "sex and/or sexual orientation," Rizzo's alternative theory of equal protection claim is not sufficiently pleaded.

### ii.  *Monell Liability*

Finally, because Rizzo's claims against individuals have failed, so too must her *Monell* claim.  *See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there . . . must be a violation of the [Plaintiff's] constitutional rights.").  A local government may be sued under § 1983 only for acts implementing an official policy, practice or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  However, where the plaintiff has not pleaded an underlying constitutional violation,"[i]t is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."  *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).  Here, there can be no "derivative municipal claim" under *Monell* because Plaintiff has not properly pleaded a constitutional violation for reasons identified *supra*.  *Mulholland*, 706 F.3d 227, 238 n. 15; *see also Brown,* 318 F.3d at 482.  Accordingly, Count VI of the Seventh Amended Complaint is dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  As discussed during the oral argument, Plaintiffs have amended their complaint, for one reason or another, seven times.  As such, the Court finds that further amendment would not only be futile but would needlessly waste scarce judicial resources and unfairly burden Defendants.  *See, e.g.*, *Brown v. Cantineri*, No. 14-6391, 2017 WL 481467, at *2 (D.N.J. Feb. 6, 2017) ("Because I have already

given [Plaintiff] one opportunity to amend, this dismissal is with prejudice."); *accord Foster v. Raleigh*, 445 F. App'x 458, 460 (3d Cir. 2011); *Venditto v. Vivint, Inc.*, No. 14-4357, 2015 WL 926203, at *15 (D.N.J. Mar. 2, 2015); *Prudential Ins. Co. of Am. v. Bank of Am., Nat'l Ass'n*, No. 13-1586, 2015 WL 502039, at *7 (D.N.J. Feb. 5, 2015).  Accordingly, Counts I, V, and VI of the Seventh Amended Complaint are dismissed *with prejudice*.

Having dismissed all federal claims raised in the Seventh Amended Complaint, the Court declines to exercise supplemental jurisdiction over claims arising under state law.  28 U.S.C. § 1367(c)(3); *Yue Yu v. McGrath*, 597 Fed. App'x. 62, 68 (3d Cir. 2014) ("[P]endent jurisdiction is a doctrine of discretion, not a plaintiff's right."); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("This Court has recognized that, 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'") (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis in original)).  Accordingly, Counts II, III, and IV of the Seventh Amended Complaint are dismissed *without prejudice*.  Pursuant to 28 U.S.C. § 1367(d), Plaintiffs are free to bring any state law claims in a state court within 30 days of the entry of Order accompanying this Opinion.

An appropriate Order accompanies this Opinion.

Date: August 30, 2021

*s/Esther Salas*
**Esther Salas, U.S.D.J.**